ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK



─────────────────────────────────

ARBOR HILL CONCERNED CITIZENS
NEIGHBORHOOD ASSOCIATION,
ALBANY COUNTY BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, AARON MAIR; MARYAM
MAIR; and MILDRED CHANG,

        Plaintiffs,

  v.

COUNTY OF ALBANY and ALBANY COUNTY
BOARD OF ELECTIONS,

        Defendants.

─────────────────────────────────

1:  03-CV-502

**APPEARANCES:**          **OF COUNSEL:**

DerOHANNESIAN & DerOHANNESIAN   Paul DerOhannesian II, Esq.
*Counsel for Plaintiffs*
39 Pearl Street, 1st Floor
Albany, New York  12207

LAWYERS' COMMITTEE FOR CIVIL
 RIGHTS UNDER LAW        Cara Fineman, Esq.
*Counsel for Plaintiffs*
1401 New York Avenue, N.W.
Suite 400
Washington, D.C.  20005

MICHAEL C. LYNCH, ESQ.
Albany County Attorney
*Counsel for Defendants*
County Office Building
112 State Street, Room 900
Albany, New York 12207

NORMAN A. MORDUE, District Judge

### MEMORANDUM-DECISION AND ORDER

**I.  INTRODUCTION**

  Plaintiffs commenced this action on April 22, 2003, alleging that a legislative

redistricting plan adopted by defendant Albany County following the 2000 Census violated §

2 of the Voting Rights Act of 1965, ("VRA") as amended, 42 U.S.C. § 1973. Plaintiffs'

motion for a preliminary injunction enjoining defendants from conducting elections for the

Albany County Legislature until a new redistricting plan is adopted was referred to the Hon.

David R. Homer, United States Magistrate Judge, for a Report-Recommendation pursuant to

28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). After finding that plaintiffs had

demonstrated the subject redistricting plan was likely to be held violative of the VRA,

Magistrate Judge Homer recommended that plaintiffs' motion for a preliminary injunction be

granted. Defendants filed timely objections to the Report-Recommendation. Plaintiffs did

not object.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court engages in a *de novo* review of any

part of a magistrate judge's report-recommendation to which a party specifically objects.

However, "[w]hen parties make only frivolous, conclusive or general objections, the court

reviews the report-recommendation for clear error." *See Brown v. Peters*, 1997 WL 599355

at *2 (N.D.N.Y.1997) (Pooler, J.) (citing *Camardo v. General Motors Hourly-Rate*

*Employees Pension Plan*, 806 F.Supp. 380, 382 (W.D.N.Y.1992)); *see also Greene v. WCI*

*Holdings Corp.*, 956 F.Supp. 509, 513 (S.D.N.Y.1997). Failure to object timely to any

portion of a magistrate's report-recommendation operates as a waiver of further judicial

review of those matters. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Small v.*

*Secretary of Health & Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The alleged facts on which the present motion is based are set forth in the Report-

Recommendation prepared by Magistrate Homer which this Court adopts:

Albany County ("County") is comprised of eighteen cities, towns

2

and villages, the largest of which is the City of Albany ("City"). The County is governed by a County Executive and the County Legislature ("Legislature"). The Legislature consists of single members elected from each of thirty-nine districts in the County. Compl. at ¶ 21. Elections to the Legislature are held every four years with the next election scheduled for November 4, 2003. The thirty-nine districts are defined by local law and are comprised of approximately equal numbers of residents based on data supplied by the United States Census Bureau. Defs. Mem. of Law (Docket No. 11) at 1-2. Thus, the County must redistrict itself following each decennial national Census. *Id.*

The 1990 Census reported that the total population of the County was 292,594, the total population of blacks was 24,068 (8.2%), and the total population of Hispanics was 5,311 (1.8%). Consent Decree (Docket No. 1, Ex. B) at ¶ 6. Following the 1990 Census, the Legislature enacted a redistricting plan which created a single district in the City containing a majority of minorities in the population ("majority/minority" district) but which contained several other districts with a minority population of up to 48%. Compl. at ¶ 52 & Ex. B. A lawsuit was commenced in which the plaintiffs alleged that this plan diluted the voting strength of minorities and sought a plan which included additional majority/minority districts. *See NAACP v. Albany County*, No. 91-CV-1288 (CGC) (N.D.N.Y. filed Nov. 7, 1991). That lawsuit was resolved with the entry of a consent decree which vacated the County's redistricting plan and mandated creation of a new plan which included three majority/minority districts, or 7.7% of the County's districts. Compl. at ¶ 57 & Ex. B, p. 7. The plan thereafter adopted by the Legislature included as majority/minority Districts 2, 3 and 5, all in the City, and minority legislators were thereafter elected from each of those districts. Compl. at ¶ 58. District 4 had a minority population exceeding 40%. Choniman Decl. (Docket No. 10) at ¶ 21. Districts 2, 3, 4 and 5 were all located wholly within the eastern portion of the City.

The 2000 Census reported that the population of Albany County had increased to 294,565, the black population had increased to 31,514 (approximately 10.7%) and the Hispanic population had increased to 9,079 (approximately 3.1%). Cooper Decl. (Docket No. 5) at ¶ 6 & Ex. A. Based on this Census, the Legislature adopted Local Law J on December 2, 2002, which redistricted the County according to the 2000 Census. Lynch Aff. (Docket No. 10) at ¶ 4. The County Executive approved Local Law J on

3

December 20, 2002, and it was filed with the New York Secretary of State on January 31, 2003, as Local Law No. 1 for 2003. *Id.*

To satisfy the constitutional mandate of one person, one vote, Local Law No. 1, or the County Plan, redrew the boundaries of the districts to achieve an ideal population in each district of approximately 7,553 (County population of 294,565 divided by 39). Chonigman Decl. at ¶ 8. Districts 2, 3 and 5 remained majority/minority districts but were augmented principally by portions of District 4 to achieve the necessary total population. *Id.* at ¶ 19. Five other districts wholly or partially within the City, including District 4, contained minority populations of 30-39%. Compl. at ¶ 66; Ans. at ¶ 9. The County Plan included only blacks in its definition of "minorities." Compl. at ¶ 20. District 4, however, was redrawn to join the substantial minority population of the former District 4 in the City "with the predominantly white, affluent suburban community of Loudonville in the Town of Colonie." Compl. at ¶ 68; Ans. at ¶ 19. Thus, with a black population of approximately 10.7% and a Hispanic population of approximately 3.1%, the County Plan continued the number of majority/minority districts at three, or 7.7%, the number of majority/minority districts under the 1990 Census when 8.2% of the population was black and 1.8 % was Hispanic.

Plaintiffs are two unincorporated membership organizations formed to advance the interests of blacks and other minorities. Compl. at ¶ 6-9. The three individual plaintiffs are City residents and self-identified as being of two or more races (Aaron Mair), Hispanic (Maryam Mair) and black (Mildred Chang). Compl. at ¶¶ 11, 14, 15; Mair Decl. (Docket No.14) at ¶¶ 1, 4. Chang is a resident of District 4. Compl. at ¶ 16. Plaintiffs contend that by maintaining the existing number of majority/minority districts at three despite the increase in minority population in the 2000 Census, the County Plan violated the Voting Rights Act by failing to create a fourth majority/minority district. Four majority/minority districts would constitute 10.3% of the thirty-nine districts in the County. Plaintiffs seek an injunction compelling the County to adopt a new plan creating such a district.[1]

---

[1]

In footnotes included as part of this portion of the Report-Recommendation and Order, Magistrate Judge Homer also included the following information:

## III.   THE REPORT-RECOMMENDATION

After setting forth the appropriate standard for issuance of a preliminary injunction,

and determining that plaintiffs' claim of potential abridgment or dilution of their voting rights

was an irreparable harm, the Magistrate Judge also concluded that at least one plaintiff -

---

1) Plaintiffs assert three causes of action in their complaint.  They seek a preliminary injunction only on the first cause of action under the Voting Rights Act.  *See* Pls. Reply Mem. of Law (Docket No. 18) at 1 n.l;

2) The parties submitted sworn statements in support of and opposition to plaintiffs' motion for a preliminary injunction.  *See* Docket Nos. 4, 5, 10, 12-17, 24, 25.  In addition, both the complaint (Docket No. 1) and the answer (Docket No. 9) are verified and, therefore, both may also be considered as sworn statements.  The parties were afforded the opportunity to cross-examine any adverse declarant at a hearing on June 25, 2003, (Docket No. 21), but all parties declined that opportunity.  Tr. of hearing (Docket No. 27) at 3-4.  Thus, the facts as set forth by Magistrate Judge Homer "are those set forth in the complaint, answer and other sworn statements submitted in connection with the pending motion;"

3) As used by the Magistrate Judge, "blacks" refers to individuals who identified themselves in a Census as non-Hispanic blacks or African Americans;

4) As used herein, "Hispanics" refers to individuals who identified themselves in a Census as Hispanic or Latino; and

5) Unlike the 1990 Census, the 2000 Census allowed respondents to identify themselves as being "of two or more races."  U.S. Dep't of Justice Guidance Concerning Redistricting & Retrogression Under Section 5 of the Voting Rights Act, 66 Fed. Reg. 5412 (Jan. 18, 2001); Cooper Decl. at Ex. A; Tr. of Hearing at 7-8, 49-50.  Thus, individuals of multiple race who identified themselves as black in the 1990 Census could choose to identify themselves as of multiple race in the 2000 Census.  It appears that this population comprised approximately 1.4%, or 4,044 people, of the County's population in 2000.  Cooper Decl. at Ex. A.  The percentages of minorities in the districts at issue in this case may be increased by as much as 5% if these categories are included as minorities.  *See* Cooper Decl. at Ex. E.  The United States Department of Justice allocates any individual who self-reported as white and one of the five other categories of races to the minority race.  66 Fed. Reg. 5412; Cooper Decl. at Ex. E.  It appears, however, that the County did not count such individuals as minorities in its Plan.  *See* Tr. of Hearing at 32, 49-50.

5

Mildred Chang - had standing to raise the VRA claim.[2]  Magistrate Judge Homer discussed in detail each of the three preconditions to raising a claim of minority vote dilution under the VRA as set forth by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986) as well as nine additional factors for evaluating the "totality of circumstances" which allegedly denies minorities in Albany County equal access to the political process. After conducting an evidentiary hearing and reviewing all evidentiary submissions and arguments of the parties, Magistrate Judge Homer found that plaintiffs had demonstrated that there was a substantial likelihood they would succeed in establishing that the County's redistricting plan - adopted following the 2000 Census - unlawfully diluted minority votes in violation of § 1973 of the VRA.  Based thereupon, the Magistrate Judge recommended that this Court issue a preliminary injunction enjoining defendants from conducting elections for the Albany County legislature pending adoption of a new redistricting plan which creates a fourth majority/minority district and otherwise complies with the VRA.

Having conducted a *de novo* review of the record, the Court agrees with the determination of the Magistrate Judge that plaintiffs' motion for a preliminary injunction should be granted.

## IV.     DISCUSSION

A.      Standard of Review

1.      Preliminary Injunction Standard

A party seeking preliminary injunctive relief must show that: 1) absent such relief it

---

[2]

Defendants do not object specifically to the Magistrate Judge's determination concerning "irreparable harm," nor do they specifically object to his conclusion regarding standing - the County simply "reserves the right to raise a jurisdictional objection to standing."

will suffer irreparable harm; and 2) either that it is likely to succeed on the merits, or that there are "sufficiently serious questions" going to the merits, and that the balance of hardships tips decidedly in favor of the moving party. *Wright v. Guiliani,* 230 F.3d 543,547 (2d Cir. 2000) (internal quotation marks and citations omitted).  However, when a plaintiff seeks to enjoin government action and alter the "status quo" of the parties pending resolution of the merits of the litigation, the movant must satisfy the more rigorous "likelihood-of-success" standard. *No Spray Coalition, Inc. v. City of New York,* 252 F.3d 148, 150 (2d Cir. 2001) (quoting *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir. 1999).  In this case, plaintiffs are asking the County to discard its current redistricting plan and adopt a new one to include a fourth majority/minority district and to cease all county election activity until the revised plan has been adopted.  Clearly these actions would disrupt the *status quo,* thus triggering plaintiffs' obligation to demonstrate substantial likelihood of success on the merits.  No party suggests that Magistrate Judge Homer applied the wrong standard in this case.

2.      Likelihood of Success on the Merits

The VRA provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . .

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the

7

> State or political subdivision is one circumstance which may be
> considered: *Provided,* That nothing in this section establishes a
> right to have members of a protected class elected in numbers
> equal to their proportion in the population.

42 U.S.C. § 1973 (a)-(b) (emphasis in original).  It is well-settled and undisputed that the

Supreme Court's decision in *Gingles* controls in cases involving a claim of unlawful dilution

of minority voting strength under § 1973 of the VRA.  Under *Gingles,* a litigant making such

allegations must first demonstrate three preconditions:

> First, the minority group must be able to demonstrate that it is
> sufficiently large and geographically compact to constitute a
> majority in a single member district . . .. Second, the minority
> group must be able to show that it is politically cohesive . . ..
> Third, the minority must be able to demonstrate that the white
> majority votes sufficiently as a bloc to enable it--in the absence of
> special circumstances, such as the minority candidate running
> unopposed--usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50-51 (1986).  Each of the three preconditions must be proven by a

preponderance of the evidence. *Id.* at 50.  These preconditions essentially ask whether the

court can fashion a remedy for a demonstrated abridgement of Section 2 of the VRA; no

remedy would exist under Section 2 for a group that lacks the population or political

cohesiveness, or is too geographically dispersed, to benefit from single-member districts. *Id*

at 51, n. 17.

    The report of the United States Senate which accompanied the 1982 amendments to

the VRA emphasized that the "right" question to ask in a voting dilution case is whether "as a

result of the challenged practice or structure plaintiffs do not have an equal opportunity to

participate in the political processes and to elect candidates of their choice." S. Rep. No.

97-417, 97th Cong.2nd Sess. 28 (1982), U.S. Code Cong. & Admin. News 1982, pp. 177, 205

(hereinafter S. Rep.).  "To answer this question, a court must assess the impact of the

contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" *Gingles,* 478 U.S. at 44 (quoting S. Rep. at 27, U.S. Code Cong. & Admin. News 1982, p. 205.)

> The Senate Report specifies factors which typically may be relevant to a § 2 claim: the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 44-45 (citing S. Rep. at 28-29).

> The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value. The Report stresses, however, that this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, the Senate Committee observed that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Rather, the Committee determined that "the question [of] whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,' " and on a "functional" view of the political process.

*Id.* (citations omitted). Courts have held these enumerated factors to be "guideposts" for

9

factual analysis of a voting dilution claim. *Goosby v. Town Bd. of Hempstead,* 180 F.3d 476, 492 (2d Cir. 1999).

B.    *Gingles* Preconditions

The Magistrate Judge made careful factual findings[3] in determining that plaintiffs had satisfied the three *Gingles* preconditions to raising a VRA claim.  Defendants first contend that the Magistrate Judge erred by improperly assuming that the County was required to maximize the number of majority/minority districts.  As evidence of the alleged improper assumption, defendants point out that Magistrate Homer, after analyzing voting age percentages of minorities in districts adjoining the three majority/minority districts in the County redistricting plan, "effectively concluded 'what could have been done . . . should have been done.'"  Defendants' Objection 3, p. 2 (citing *Johnson v. DeGrandy,* 512 U.S. 997, 1009 (1994) (trial court reversed after erroneous determination that evidence establishing three *Gingles* preconditions "without more" satisfied "totality of circumstances" analysis for voting

---

[3]

As a threshold matter, defendants object to the Report-Recommendation on the ground that it "recommends relief beyond the scope of the scheduling order issued [by Magistrate Judge Homer] on June 19, 2003."  To wit, defendants contend that the hearing conducted by Magistrate Judge Homer was supposed to be "limited to plaintiff's motion for a preliminary injunction and will not be combined with a trial on the merits."  Based thereupon, defendants argue that the Report-Recommendation, which suggests issuance of an injunction prohibiting all county election activity pending adoption of a fourth majority district, is a "recommendation on the merits" which "goes beyond the June 19, 2003, order."  With evaluation of the likelihood of plaintiffs' success on the merits of the litigation essential to issuance of an injunction, defendants' objection to the Magistrate Judge's evaluation of the merits is peculiar, especially since the motion at issue herein is not dispositive.  Moreover, the authority vested in the Magistrate Judge to hear and make a recommendation in this case derives from this Court's Referral Order issued June 12, 2003, which expressly stated that the Magistrate was "[t]o conduct hearings, including evidentiary hearings if necessary and/or a trial on the merits of the claims raised in the complaint if the Magistrate Judge deems such action appropriate, and to submit to [this Court] proposed findings of fact and recommendation for the disposition of plaintiff's application for relief."

10

dilution claim).  It is clear from review of the Magistrate Judge's lengthy and detailed Report-Recommendation that he did not make any improper assumptions concerning the County's obligations in this case.  In contrast to defendants' contention, the Magistrate Judge did not conclude that the County was required to **maximize** the number of majority/minority districts.  Rather, Magistrate Judge Homer clearly stated that the VRA required the County to create majority/minority districts in fair - not direct - proportion to the population of minorities in the City of Albany.  Furthermore, unlike the trial court in *DeGrandy*, Magistrate Judge Homer found evidence which demonstrated unequal access to the political process for minorities in Albany County in addition to the evidence which supported plaintiffs' satisfaction of the three *Gingles* preconditions.

1.      Size and Geographic Compactness

        Under the framework set forth in *Gingles*, plaintiffs must first demonstrate that there are minority groups living outside existing majority/minority districts that are sufficiently large and geographically compact to create additional majority/minority districts.  As a threshold matter, Magistrate Judge Homer had to decide what constitutes a "minority group" for the purpose of the *Gingles* analysis.  The Magistrate Judge noted that while plaintiffs included Hispanics along with non-Hispanic blacks in their definition of minority, the County did not.[4]  Given existing law in the Circuit Courts, including the Second Circuit, which assumes diverge minority groups can be combined to meet VRA litigation requirements (*see Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 276 (2d Cir.)

---

[4]

The County's exclusion of Hispanics was notable insofar as the 1991 consent decree, which resulted from nearly identical litigation between the parties, included non-Hispanic blacks and Hispanics in the negotiated new majority/minority districts.

11

*vacated and remanded on other grounds,* 512 U.S. 1283 (1994)), it was entirely appropriate for the Magistrate Judge to  combine black and Hispanic populations in his analysis.[5]

Defendants object to the Magistrate Judge's alleged misapprehension of data in Exhibits "A" and "E" attached to the affidavit of plaintiffs' expert, William Cooper.  To wit, Magistrate Judge Homer concluded that based on the figures in Exhibit "A," the total number of blacks in the County is 31,514 (of which 21,020 are of voting age) and the total number of Hispanics is 9,079 (of which 5,861 are of voting age).  According to figures in Exhibit "E" - unchallenged by defendants and derived from 2000 Census data - the total number of voting age blacks in majority/minority districts 2, 3 and 5 of the County plan is 9,178.  Each of these districts has significantly more blacks (55.8%, 59.18% and 60.48% respectively) than is needed to justify the majority/minority classification.  Given the number of voting age blacks - 11,842 - living outside of districts 2, 3 and 5 and in the vicinity of existing majority white district 4, the Magistrate Judge noted correctly that the black population **alone** outside of the existing majority/minority districts was sufficiently large to warrant creation of a fourth majority/minority district.

Defendants contend that the Magistrate Judge erred when concluded that the figures which appeared in Exhibit "E" for the Hispanic population included those individuals of voting age and provided further evidence that significant numbers of minority voters were living outside existing majority/minority districts.  Clearly, the total number of Hispanics in the various districts as set forth in Exhibit E - 9079 - represents the total general population

---

[5]
Likewise, it was appropriate for the Magistrate Judge to exclude those identified as "multiple race" from the analysis since plaintiffs did not present evidence of how many multiple race identifications were included in their statistical data.

rather than the voting age population as confirmed by the figures in Exhibit "A." However, even assuming an error on the part of the Magistrate Judge in reviewing these figures, his conclusion regarding the size of the minority group living outside existing majority/minority districts is fully supported by the record since the number of blacks in these areas - independent of Hispanics - is sufficient to satisfy the first *Gingles* precondition. As a further matter, defendants cite no authority for the proposition that a court is **required** to consider only voting age minority percentages in any event. Certainly, the VRA, and its accompanying legislative and judicial history contains no such provision. In this vein, the general population percentage of minorities of Hispanic descent living outside the existing majority/minority districts is significant in and of itself.

Insofar as plaintiffs' obligation to demonstrate geographic compactness of minority groups living outside existing majority/minority districts, the Magistrate Judge found plaintiffs met their burden for three reasons:

> First, the 2000 Census reported that over 77% of the blacks in the County reside within the City. Cooper Decl. at ¶ 6.  Moreover, five districts immediately adjoining the three majority/minority Districts 1, 4, 6, 7 and 8 contain a total voting age population of blacks of 5,659 and a total voting age population of Hispanics of 2,150.  Cooper Decl. at Ex. E.  These eight districts, from which a fourth majority/minority district would be created, constitute 21% of the total number of districts but contain 59% of the total voting age population of blacks in the County and 47% of the total voting age population of Hispanics in the County. *Id.*

> Second, District 4 under the County Plan overlaps the community in the northeastern portion of the City which contains a substantial number of blacks and Hispanics with the predominantly white population of Loudonville in the Town of Colonie.  While a map indicates that the two communities are geographically contiguous, a map does not reveal the geographical chasm between the two communities created by a valley and an interstate highway passing directly across the district between the two communities.

13

Moreover, the two communities share virtually nothing in common.   Among other things, they are governed by different municipalities, they are policed by different departments, fire and other emergency response teams come from different organizations, and community organizations and youth sports teams are separately operated.  The children attend different public schools.  Loudonville is predominantly white and affluent.  The adjoined northeastern Albany area is not.  The redistricting which led to the anomalous creation of District 4 underscores the geographical compactness of the black and Hispanic populations within the eastern part of the City.  *See Goosby,* 956 F. Supp. at 349.

Third, plans proposed by plaintiffs demonstrate that a fourth majority/minority district could be created in the area of existing District 4.  *See* Compl. at ¶ 77, 78 & Ex. C; Cooper Supp. Decl (Docket No. 12) at ¶ 9-19 & Exs. A-F.  These plans illustrate the feasibility of creating a fourth majority/minority district  in the area of existing District 4 and further support contention that blacks and Hispanics are geographically compact within the eastern portion of the City.

Defendants object again to the Magistrate Judge's alleged misapprehension of the data regarding Hispanics.  Defendants contend that Magistrate Judge Homer's conclusion regarding geographic compactness of minority groups outside the majority/minority districts was based on the faulty assumption that there were 2,150 voting age Hispanics in these adjoining districts.  However, as referenced above, even assuming such an error on the part of the Magistrate Judge, the population of voting age blacks alone in the adjoining majority white districts is sufficient to demonstrate geographic compactness.  The addition of the additional general Hispanic population only augments support for the conclusion that there are sufficient numbers of minorities currently excluded from existing majority/minority districts to satisfy the first *Gingles* precondition.

Defendants also object to the Magistrate Judge's reliance on the stark contrast between the part of District 4 situated in the City and that part now located in the Town of

14

Colonie due to the I-90 valley arguing that this alleged "geographic chasm" was not **created** by Local Law J (the 2002 redistricting plan which is the subject of this lawsuit).  Indeed, defendants contend that the 4th District created pursuant to the 1991 consent decree "included a residential area along Albany Shaker Road and a residential neighborhood commonly known as Bishops Gate, as well as the Loudon Arms apartment complex across the street from Memorial Hospital."  However, it is clear that the areas north of I-90, "historically" included as part of district 4, were entirely contained within the City of Albany whereas the new district 4 extends northward into the Town of Colonie.  Moreover, even if the new district 4 boundary challenged as unlawful by plaintiffs is not "new" as alleged by defendants, there is no basis to prohibit plaintiffs from complaining about this issue now even if they neglected to do so in 1991.

Defendants' object to the Magistrate Judge's reliance on the supplemental affidavit of plaintiffs' expert, William Cooper, which affirms that plaintiffs' proposed redistricting plan reasonably creates a fourth majority/minority district from minority groups residing in areas contiguous to the existing majority/minority districts.  Defendants contend that Cooper's assessment of plaintiffs' proposed redistricting plan is flawed because it is based on the same allegedly defective data set forth in Exhibit "E" of his original affidavit (*see* Discussion in Section IV(B)(1) *infra*).  To wit, defendants argue that the figures referenced by Cooper demonstrate total - not voting age - population of Hispanics and thus his conclusions regarding geographic compactness of minority group(s) residing outside the existing majority/minority districts is suspect.  Again, however, defendants decry a red herring.  It is clear that Cooper's opinion concerning the feasibility of creating a **fourth** majority/minority district - the basis for the Magistrate Judge's recommendation in this case - is based **solely** on

15

the population of **non-Hispanic** blacks living outside districts 2, 3 and 5.  Cooper relies on data relative to Hispanic persons in these areas only to the extent that he confirms plaintiffs' position that it is also possible to create a fifth majority/minority "coalition district" by combining non-Hispanic black and Hispanic populations.

Finally, on the issue of geographic compactness, defendants argue that it was improper for the Magistrate Judge to conclude that the County "endeavored to minimize the percentage of minority voters in its plan by not factoring in the multiple race category."  This argument ignores completely the fact that the Magistrate Judge noted the County's failure to include multiple race identifications in its definition of minority was **but one** example of its attempt to minimize the percentage of minorities in districts where doing so would lend support to its argument that the disputed redistricting plan is sufficient under the VRA.  It is undisputed that the County included both non-Hispanic blacks and Hispanics as minorities in formulating the 1991 redistricting plan following the consent decree entered into by the parties but declined to include Hispanics when it passed Local Law J.  Moreover, the disputed 2002 redistricting plan is based on data reflecting the voting age population of minorities, rather than the general minority population used by the County in 1991.  It is undisputed that the voting age population in Albany County contains lower percentages of minorities and use of voting age data would ostensibly strengthen the County's contention that the 2002 redistricting plan meets the requirements of the VRA..

2.      Political Cohesiveness of Minority Group

Defendants object to alleged errors committed by the Magistrate Judge in assessing the political cohesiveness of minority groups living outside existing majority/minority districts as required by *Gingles.*  "A showing that a significant number of minority candidates

16

usually vote for the same candidates is one way of proving the political cohesiveness

necessary to a vote dilution claim." *Gingles,* 478 U.S. at 56.  As a threshold matter, the Court

notes that defendants' objections on this issue are based entirely on alleged insufficient proof

of cohesiveness between non-Hispanic blacks and Hispanics.  These objections may be

largely academic since, as noted on multiple instances above, the population of non-Hispanic

blacks not already living in majority/minority districts alone would likely be sufficient on its

own to justify creation of a fourth minority district in fair proportion to the allegedly diluted

minority vote. *See DeGrandy,* 512 U.S. at 1017.  Moreover, no one has raised a question in

this case concerning the political cohesiveness of the black community in Albany

County.  Nevertheless, the determination of the Magistrate Judge that plaintiffs had

demonstrated evidence of political cohesion between blacks and Hispanics is amply

supported by the record.

Defendants object to Magistrate Homer's reliance on the 1991 consent decree as an

"admission" that non-Hispanic blacks and Hispanics were politically cohesive.  True, as

argued by defendants, the 1991 consent decree did not "expressly acknowledge" political

cohesiveness between the two groups but the County cannot seriously dispute that the decree

did so impliedly.[6]

Defendants also object to Magistrate Judge Homer's alleged "shifting" of the burden

of proof on the issue of political cohesiveness to the County.  It is evident from the plain

---

[6]

The terms of the consent decree required the County to: 1) adopt a new redistricting plan
including "three majority Black and Hispanic legislative districts;" and 2) create two
additional majority districts each containing a "combined black and Hispanic population of at
least 63 %."

language of the Report-Recommendation that Magistrate Judge Homer did no such thing.

Rather, he clearly found plaintiffs' failure to offer statistical evidence of voting patterns, but

noted cohesiveness between blacks and Hispanics could be established based on other

evidence.  Defendants' failure, as outlined by the Magistrate Judge, was in neglecting to

submit evidence to rebut the admission of cohesiveness between these groups implied in the

1991 Consent Decree.

Finally, regarding the second *Gingles* precondition, defendants object to the

Magistrate Judge's reliance on anecdotal evidence of cooperation between blacks and

Hispanics on political and social issues as set forth in affidavits submitted by plaintiffs.  First,

defendants contend that it was error for Magistrate Judge Homer to observe that this evidence

was "uncontradicted."  To wit, defendants contend that they have not had an opportunity to

cross-examine the witnesses who averred that blacks and Hispanics have jointly participated

in and supported each others' social and cultural events, political issues, youth sports and

community newspaper.  That defendants either did not, could not or chose not to rebut the

evidence submitted by plaintiffs to date does not alter the fact that the evidence is

uncontradicted.  Secondly, defendants argue that the Magistrate Judge determined the same

affidavits submitted by plaintiffs on the issue of political cohesiveness between blacks and

Hispanics were so vague and conclusory as to constitute insufficient evidence of "racially

charged" elections in Albany County.  However, that the evidence submitted by plaintiffs is

not persuasive on one issue is not dispositive of whether the same evidence is probative of

another.  The Court agrees with the Magistrate Judge that the anecdotal evidence submitted

by plaintiffs was sufficient to demonstrate a reasonable degree of political cohesiveness

between blacks and Hispanics, even if that same evidence was unpersuasive on the issue of

18

"racially charged" elections in Albany County.

3.    White Bloc Voting

To satisfy the third *Gingles* precondition, a plaintiff must show that "the white majority votes sufficiently as a bloc to enable it . . . **usually** to defeat the minority's preferred candidate." *Goosby,* 180 F.3d at 491 (emphasis added); see also *Voinovich v. Quilter,* 507 U.S. 146, 158 (1993).  Defendants contend that the Magistrate Judge erred in concluding that this precondition had been satisfied.  Indeed, Magistrate Judge Homer found racially polarized voting on the basis of the following "unrebutted" evidence: (1) no minority candidate has ever been nominated to run for County-wide office; (2) only once has a minority candidate ever been endorsed by a major political party for an election in a white-majority district; (3) in the only election held in district 4 since its creation in 1991 the minority candidate who opposed the white candidate received 26% of the vote despite the population of over 40% minorities in the district while the white candidate prevailed with 73 % of the vote; and (4) an analysis of city-wide school board elections between 1995 and 2001 revealed that white voters "consistently voted as a bloc for candidates other than the black candidates who were minority-preferred."

The County first contends that it was error for the Court to refer to the above evidence as "unrebutted" since the County "denied knowledge or information [sufficient] to form a belief as to truth of these allegations" in its answer.  Since the County has thus "called these factual allegations into dispute," defendants argue it should be afforded time for discovery to ascertain their factual bases.  Neither the determination of the Magistrate Judge concerning the issue of "white bloc voting" nor this Court's potential adoption of said determination is dispositive of the issue since there are no dispositive motions pending at this time.  No one,

19

certainly not this Court, has suggested that defendants are not entitled to discovery in this case. However, that defendants may be entitled to discovery to attempt to refute the facts concerning Albany County's election history does not alter the facts as they are known to the parties, and indeed the public, today. If defendants are aware of a minority candidate who ran for county-wide office or was endorsed by a major party to run in a white majority district, they are obligated to come forward with such evidence now to defeat plaintiffs' application for an injunction. They cannot simply deny knowledge or information as to the truth of the allegations and expect to thwart the Court's reliance on undisputed historical facts. The question currently before the Court is merely whether plaintiffs have demonstrated sufficient evidence of white bloc voting to suggest they are likely to prevail on the merits of their vote dilution claim. To answer this question, the Court is free to take note of any facts placed before the Court by plaintiffs and undisputed - to date - by defendants.

Defendants contend that the Magistrate Judge's analysis of the above-referenced undisputed evidence demonstrates that he failed to distinguish between the different legal concepts of "white bloc voting" and "racially polarized voting." Essentially, defendants argue that while there may be evidence that voters in Albany County are polarized in their preference for candidates of their own race, there is scant statistical evidence showing that white majority voters consistently vote **as a bloc** to defeat candidates preferred by the minority. This argument is literally true, but only because in most cases, **no minority candidate can even get on the ballot.** Defendants cannot seriously contend that plaintiffs are not entitled to the weight of historical evidence showing that minority candidates have not had the opportunity to compete in county-wide or white majority legislative district elections, particularly when such evidence suggests the pervasiveness of "racially polarized" voting

20

eclipses the possibility of demonstrating "white bloc" voting.  This scenario should not be a bar to plaintiffs' attempt to satisfy the third *Gingles* precondition.

Defendants also object to the Magistrate Judge's reliance on the expert report prepared by Dr. Paul Liu, arguing that his conclusions were tenuous and based on undefined data.  Dr. Liu opined: "In sum, while caution should be exercised due to the limitation on the dataset available at this time, the analyses based on the visual scatterplot and various statistical procedures suggest that voting in the county-legislature election and five [school board] elections from 1995 to 2001 has shown the characteristics of "racial polarization" defined by the Supreme Court in *Thornburg v. Gingles* . . ."  True, Dr. Liu stated his observations were based on a "preliminary" precinct by precinct analysis of votes for various candidates compared to data from the 1990 Census concerning racial composition of the electorate in each precinct.  However, there is nothing tenuous about his conclusion that "African American voters, based on the preliminary data analysis, expressed a preference for African American candidates and this preference was not shared by the non-African American voters."  As a further matter, this Court agrees with the Magistrate Judge's determination that defendants' emphasis on the results of city-wide at-large elections for nine school board seats between 1999 and 2002 wherein four minority candidates were successful ignores the standard for demonstrating evidence of white bloc voting.  Indeed, plaintiffs are not required to show that minority candidates **always** lose to white candidates, only that they **usually** do. *See Gingles*, 478 U.S. at 75 ("proof that some minority candidates have been successful does not foreclose a § 2 [voting dilution] claim.").  "Nothing in the [VRA] or its legislative history prohibited [the Magistrate Judge] from viewing with some caution black candidates' success in [recent city-wide school board] election[s], and from deciding on the basis of all the

21

relevant circumstances to accord greater weight to blacks' relative lack of success over the course of several recent elections." *Gingles,* 478 U.S. at 76.

C.      Totality of the Circumstances

Having agreed with the determination of the Magistrate Judge that plaintiffs presented sufficient evidence to satisfy the three *Gingles* preconditions, the Court now turns to his analysis of the "totality of circumstances" suggesting plaintiffs are likely to be successful on their VRA claim.[7] The Magistrate noted correctly that satisfaction of the three *Gingles* preconditions is not alone sufficient to make out a VRA claim. *See DeGrandy,* 512 U.S. at 1013. The "totality of the circumstances" test prescribed by the statute must also be applied to the evidence, since "the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Id.* at 1011. Congress set forth a number of factors to be considered in analyzing the "totality of circumstances" in a VRA claim in a report which accompanied amendment of the statute in 1982. *See* Discussion in Section IV(B)(2) *infra*. "Despite the apparent comprehensiveness of [these] factors, the [Supreme] Court [has] accepted the Senate Report's view that the list is neither exclusive nor comprehensive, that no specified number of factors need be proved, and that it is not necessary for a majority of the factors to favor one position or another." *See Goosby,* 180 F.3d at 492 (citing *Gingles,* 478 U.S. at 45). The nine factors relied on Magistrate Judge Homer will be considered *seriatim*.

1.      History of Voting-Related Discrimination

---

[7] The Court notes but need not consider defendants' objection to the Magistrate Judge's consideration of the "totality of circumstances" based on plaintiffs' alleged failure to satisfy the *Gingles* prerequisites.

Defendants contend that the Magistrate Judge failed to consider "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process . . . ." *Gingles,* 478 U.S. at 36-37 (quoting S. Rep. at pp. 177, 205).  As noted by Magistrate Judge Homer, this factor requires "plaintiffs [to] establish a history of discrimination whereby the challenged jurisdiction denied a specific minority group access to the political process. *Reed v. Town of Babylon,* 914 F. Supp. 843, 885 (E.D.N.Y. 1996).  It is undisputed that national Census figures definitively show that the percentages of both non-Hispanic blacks and Hispanics has steadily grown over the last two decades in the City of Albany.  These two minority groups now comprise 13.78% of the total population in Albany County.  Nevertheless, as noted by the Magistrate Judge:

> Since the County was incorporated in 1788, no minority has ever been elected to a County-wide office.  No minority has ever been nominated by a major political party to run for a County-wide office.  On only one occasion has a major political party endorsed a minority candidate in a majority-white legislative district.

Moreover, in addition to these facts which the Magistrate Judge found sufficient to demonstrate "racially polarized" voting in satisfaction of *Gingles,* Magistrate Judge Homer noted that "[o]nly once has a minority ever been appointed to head any of the nineteen departments that constitute the [County] government."  These are not the type of "general allegations" of discrimination found to be insufficient to support a VRA vote dilution claim in *Montano v. Suffolk County Leg.,* 2003 WL 21433315 (E.D.N.Y. June 21, 2003) cited by

23

defendants.  Indeed, the specific undisputed[8] historical facts relied on by plaintiffs herein are precisely the same facts which led to identical VRA litigation and a Consent Decree between the parties in 1991.  Based upon the Magistrate Judge's thorough analysis, this Court agrees that "[t]he history of the County thus demonstrates that except for elections in majority/minority districts, minorities have been effectively excluded from meaningful participation in County elections and governance."

2.      Pattern of Racially Polarized Voting

Defendants do not specifically object to the Magistrate Judge's conclusion that voting in Albany County and the area of existing district 4 is and has been characterized by racially polarized patterns.  Rather, defendants argue that Magistrate Judge Homer's determination of this issue is flawed for the reasons set forth in its arguments objecting to the analysis of "white bloc voting" under *Gingles.*  The Court agrees with the Magistrate Judge that the evidence in this case "strongly supports" the conclusion that voting in Albany County is polarized along racial lines and declines to consider defendants' recycled objections on this issue anew.

3.      Dilution Enhancing Voting Practices or Procedures

Magistrate Judge Homer noted that plaintiffs submitted no evidence that the County had used "unusually large districts, majority vote requirements, anti-single shot provisions, or

---

[8]

Defendants continually object to reference by the Magistrate to "undisputed" facts asserting that plaintiffs' allegations were "called into" question by its answer.  However, as discussed above, defendants' verified answer which "denied knowledge or information" sufficient to form a belief as to the veracity of the specific factual allegations in plaintiffs' verified complaint is not sufficient to deter the Court from relying on these unchallenged historical assertions.

24

other voting practices or procedures" to enhance dilution of minority voting and defendants do not object to this determination.

4.      Exclusion of Minority Group from Candidacy

The fourth factor noted by the Senate Report accompanying amendments to the VRA requires examination of candidate selection or "slating" and whether minorities have been denied access to this process. *See Gingles*, citing S. Rep. at pp. 28-29. Of critical importance in the Magistrate Judge's analysis of this factor was the oft repeated history of voting in Albany County which demonstrates that minorities have not been selected as candidates for county-wide office or for office in non-majority/minority districts. In addition, Magistrate Judge Homer noted anecdotal evidence in the declaration of plaintiff Aaron Mair who attested to exclusion of minority candidates from the slating process. To wit, Mr. Mair averred that when he ran for the City of Albany school board, he was told **by the Democratic Party Candidate screening committee** that "[he] would have little chance of being elected citywide as a minority." True, as defendants contend, the statement is "unsubstantiated," but it is not conclusory. It is a specific allegation that a particular political committee made a specific statement to an identifiable minority candidate. Moreover, plaintiffs burden at the present time is to submit evidence in support of their claim. Defendants cite no legal authority for their contention that relevant evidence submitted in support of a preliminary injunction motion be "substantiated."

5.      Effects of Past Discrimination

Magistrate Judge Homer noted, after reviewing the 2000 Census data, that minorities "continue to lag behind the white majority in virtually all socio-economic categories, including education, housing, income and mobility." Consequently, he concluded that the

record sufficiently demonstrated evidence that minorities in Albany County "continue to bear effects of [past] discrimination to varying degrees in most such areas." Again, defendants do not specifically object to this determination and the Court agrees with the Magistrate Judge's conclusion on this issue.

6.     Use of Racial Appeals

Magistrate Judge Homer concluded that plaintiffs had failed to present evidence that political campaigns in Albany County were "characterized by overt or subtle racial appeals." He declined to consider anecdotal evidence submitted by plaintiffs on this issue persuasive since it was comprised largely of inadmissible hearsay and/or vague, conclusory statements. Defendants do not object to this determination of the Magistrate Judge and the Court finds no error accompanying it.

7.     Past Election of Minority Group Members

The Magistrate Judge noted that "the extent to which members of the minority [had] been elected to public office **in the jurisdiction,**" along with the existence of racially polarized voting were the most important factors for courts to consider in analyzing the "totality of circumstances" under the VRA. *See Gingles,* 478 U.S. at 36-37 (citing S. Rep. at pp. 28-29) (emphasis added). Once again defendants object to the Magistrate Judge's reliance on undisputed facts concerning the voting and election history in Albany County which they claim were "placed in dispute" in their answer. The Court rejects this argument as it has done repeatedly herein. Moreover, the County contends that the Magistrate Judge's failure to consider "anything other than County-wide and County legislative elections," is error because minority candidates have historically been elected in the City of Albany which is within the district. This argument is easily dismissed. The "jurisdiction" at issue herein is

26

Albany County, not the City of Albany.  No party can seriously contend that the VRA was intended to validate counties with legislative redistricting which wholly dilute minority votes so long as minority voices in cities or portions of cities within the county's jurisdiction were not so diluted.

8.      Responsiveness to Needs of Minorities

Again, the Magistrate Judge determined correctly that plaintiffs had failed to submit evidence suggesting that the County had been unresponsive to the needs of minorities and defendants do not object to this determination.

9.      Policy Underlying Redistricting

Defendants object at the outset to the opening statement in the Magistrate Judge's analysis of this ninth and final factor.  To wit, defendants contend that it was error for the Magistrate to state "the policy" at issue "is the County's determination in its Plan not to create a fourth majority/minority district," because - according to defendants - "the ultimate plan was the result of policies applied by the County's consultant."  It strains the bounds of credulity for defendants to argue that the County is not responsible for the redistricting plan at issue in this case because it was conceived and recommended by its retained, unelected, private consultant.

According to the County's expert, the controversial 2002 redistricting plan was borne out the following circumstances: 1) the populations of existing majority/minority districts 2, 3 and 5 at 6538, 6654 and 6291 respectively, were significantly below the ideal population of 7,553; and 2) the former district 4 which was wholly within the City of Albany contained the largest number of minorities from which the three majority/minority districts could be enlarged while preserving their majority/minority character; and thus 3) portions of former

district 4 were added to the existing majority/minority districts and the remainder of former

district 4 was joined with a "geographically contiguous" portion of the Town of Colonie to

create existing district 4.  The Magistrate summed up the "tenuousness of the policy

underlying the County Plan" as follows:

> First, defendants' method of counting minorities for purposes of
> the Plan minimizes the percentage of minorities in the relevant
> population groups at every opportunity, even where doing so
> runs counter to defendants' previous positions or to accepted or
> recommended practices. The County Plan counts only blacks as
> the relevant minority group and excludes Hispanics from that
> definition.  However, blacks and Hispanics were considered as
> a single minority group by defendants in 1991.  Defendants now
> contend that voting age population, which contains lower
> percentages of blacks and Hispanics, is the relevant group for
> analysis, but in 1991, defendants based their plan on the general
> population.  Defendants appear not to have included any of the
> multiple race population in their definition of minority, but the
> recommended practice is to include as blacks or Hispanics those
> in that group who included either race in their multiple race
> self-identification.  These unsupported assumptions have served
> to minimize the percentages of minorities in the population.
>
> Second, retaining three majority/minority districts out of thirty-
> nine is substantially disproportional to the percentage of
> minorities in the County's population. In 1991, the County
> created the three majority/minority districts, 7.7% of the total
> number of districts, where the minority population totaled 10%
> (8.2% black and 1.8% Hispanic).  A strict proportionality
> between minority population and percentage of
> majority/minority districts is not required.  *See DeGrandy,* 512
> U.S. at 1013-14.  However, while the minority population of the
> County has grown to at least 13.8% (10.7% black and 3.1%
> Hispanic), the percentage of majority/minority districts remains
> at 7.7%.  This substantial disproportionality belies the validity
> of the policy underlying the County Plan.
>
> Third, the County Plan significantly enlarges the number of
> minorities in each of the three majority/minority districts
> beyond even the 63% majority to which the parties agreed in
> the 1991 Consent Decree.  The three districts under the County
> Plan have minority voting age populations of 65.8%, 66.5% and

67.7%. Cooper Decl. at Ex. E [opining that inclusion of all residents who identified themselves as multiple race would increase the percentages of minorities in each of these three districts by three to five percent.]  However, a majority/minority district requires only a minimum of 51% minority population and the plaintiffs in the 1991 action and defendants agreed then that a 63% minority population (including multiple race) was sufficient to constitute a majority/minority district.  Moreover, defendants assert that it was sufficient to maintain a majority/minority district if such district contained "60% of the overall population and 50% of the voting-age population."  Chonigman Decl. at ¶ 16.  Finally, four other districts surrounding Districts 2-5 contained substantial minority populations from which adjustments could have been made to increase the populations of the existing majority/minority populations, and the County Plan diluted the population of District 4, previously a near majority/minority district, to enlarge the three existing majority/minority districts.  These facts constitute substantial support for plaintiffs' argument here that the County Plan "packed" minorities into the three existing majority/minority districts to avoid creation of a fourth such district.

Finally, the anomalous results in the County Plan belie the asserted goals of the Plan.  Defendants assert that in adopting the County Plan, they endeavored essentially to achieve, in order of priority, districts approximately equal in population, to maintain the three existing majority/minority districts with minority populations of at least 60% general population and 50% voting age population, to create other majority/minority districts, to maintain existing district boundaries to the maximum extent possible and to maintain the integrity of existing communities. Chonigman Decl. at ¶ 16.  The County Plan achieved the goals of apportioning the population equally among the districts and of maintaining the three existing majority/minority districts.  However, the County Plan redrew those three districts to include minorities in percentages significantly beyond the stated goal.  It also failed to create any other majority/minority district although such was justified by the Census figures and was feasible. Further, as to District 4, the County Plan substantially changed the boundaries, reduced its minority population and joined it with a predominantly white community with which there exist[s] virtually no common ties or interests.

29

Defendants object to the Magistrate Judge's conclusion that the County attempted to minimize percentages of minorities to support its reasoning in adopting the challenged redistricting plan. This objection fails for two reasons. First, while defendants dispute the observation that they have excluded multiple race voters and changed the relevant standard from general population to voting population, they do not dispute that they have inexplicably excluded Hispanics from the definition of a minority group when Hispanics have historically been considered a minority group and were absolutely factored into the creation of the existing three majority/minority districts pursuant to the terms of the 1991 Consent Decree. Secondly, defendants contend that "the record does not validate plaintiffs['] claim of political cohesiveness as between blacks and Hispanics." As referenced above, however, it is clear that the recommendations of the Magistrate Judge in this case neither rely wholly on a finding of political cohesion between blacks and Hispanics nor depend on such a determination to be adopted by this Court.

Defendants also object to the Magistrate Judge's determination that the redistricting plan fails to achieve substantial proportionality with the percentages of minorities residing in the County was error and based on a "generic macro" view of the 1990-2000 Census change. To wit, defendants point out "detailed population shifts" - loss of population in the "downtown" area of the City of Albany - referenced by the County's consultant were largely ignored by the Magistrate Judge. Notably, the disproportionality of the redistricting plan is only enhanced when once considers that while the overall population in certain areas of the City of Albany decreased, the percentage of minorities nevertheless increased.

Defendants cite *DeGrandy* for the proposition that achieving substantial proportionality in the "challenged area" of the City of Albany satisfies the County's

30

obligation to apply the concept county-wide.  Defendants' argument impermissibly twists the holding of *DeGrandy.*  Indeed, the Supreme Court found in *DeGrandy* that providing fewer majority/minority districts in Dade County, but at the same time increasing the proportionality of majority/minority districts to the minority voting age population was not violative of the VRA.  *See DeGrandy,* 512 U.S. at 1016 ("Treating equal political opportunity as the focus of the enquiry, we do not see how these district lines, apparently providing political effectiveness in proportion to voting-age numbers, deny equal political opportunity.  The record establishes that Hispanics constitute 50 percent of the voting-age population in Dade County and under [the challenged redistricting plan] would make up supermajorities in 9 of the 18 House districts located primarily within the county.  Likewise, if one considers the 20 House districts located at least in part within Dade County, the record indicates that Hispanics would be an effective voting majority in 45 percent of them (i.e., nine), and would constitute 47 percent of the voting-age population in the area.")

Under no reasonable view of the record in this case can defendants argue that its redistricting plan achieves substantial proportionality for minority groups even within the city of Albany.  Indeed, the contention that proportionality within the City of Albany is the proper focus in this case is belied by the County's action in moving the boundaries of district four out of the City of Albany into the Town of Colonie.  Morever, as stated by plaintiff's expert, the 2000 Census revealed that over 77% of Albany County's non-Hispanic black and Hispanic populations reside within the City of Albany.  Consequently, even assuming it was appropriate (which it is not) to examine only the proportionality of majority/minority legislative districts to minority percentages in the City, defendants proffer that three out of fourteen, or 21%, of legislative districts are majority/minority districts would still fail since

31

the population of non-Hispanic black and Hispanic minorities in the City of Albany is well over 30%.  *See* Cooper Affidavit at ¶ 7-8.  Finally, as referenced above, there is no legal support for defendants' contention that the "jurisdiction" under scrutiny should be any smaller than the confines of the contested redistricting plan.

C.      Weighing of Factors

Once again, defendants do not specifically object to the manner in which the Magistrate Judge weighed the relevant factors in this case and concluded that by failing to create a fourth majority/minority district, the County plan dilutes the votes of blacks and Hispanics.  Rather, defendants incorporate by reference all of the objections which preceded the "Weighing of Factors" analysis.  After thorough review of the record in this case, the Court agrees with the determination of the Magistrate Judge that plaintiffs have presented sufficient evidence in support of their VRA claims to meet the "substantial likelihood of prevailing on the merits" standard at issue herein.

D.      Public Interest

Magistrate Judge Homer concluded that despite the imminency of the November 2003 elections, the public interest weighs strongly in favor of granting plaintiffs' request for a preliminary injunction based on the following: 1) John A. Graziano, Sr., one of the two chief elections officers for Albany County, averred that in the event of an injunction, procedures for shortening the petition process could be implemented to minimize expected disruption of both the primary and general election; 2) on balance the deprivation of the rights of blacks and Hispanics to exercise their vote and participate in the political process outweighed any disruption to the electoral process; and 3) disruption of ongoing Legislative elections is not unprecedented in Albany County as evidenced by the 1991 Consent Decree.

Defendants object on a number of grounds.  First, they argue that Commissioner Graziano's statement regarding the potential for minimizing disruption to the electoral process is "gratuitous" and "without statutory basis."  Assuming the truth of these characterizations, the County's argument is irrelevant since - as defendants themselves acknowledge - the Court, not the County, has the authority to and will fashion a remedy in this matter.  Defendants also argue that the 1991 Consent Decree is not a precedent for enjoining the electoral process since it was signed one week after "the November 1991 elections."  Defendants do not elaborate on the nature of the elections which occurred in 1991 when identical VRA litigation was pending between the parties.  However, it is absolutely clear that elections for County Legislators were postponed as a result of the 1991 Consent Decree and a special election was held the following fall for these offices after creation of the agreed upon second and third majority/minority districts.  Consequently, the Court agrees with the determination of the Magistrate Judge that the public interest herein weighs in favor of plaintiffs' request for injunctive relief.

E.    Remedies

As has been the pattern throughout its objections to the Report-Recommendation, defendants do not object specifically to the determination of the Magistrate Judge concerning appropriate remedies in this case and the court finds no error in Magistrate Judge Homer's conclusions in connection therewith.

V.    **CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that in conjunction with the Summary Order and Referral Order issued by this Court on August 16, 2003, the Report-Recommendation of Magistrate Judge Homer is

33

hereby adopted in its entirety based upon the reasons set forth by the Magistrate Judge in his Report-Recommendation and after *de novo* review upon those additional reasons set forth herein and it is therefore

ORDERED that plaintiffs' application for a preliminary injunction is hereby GRANTED; and it is further

ORDERED that defendants are enjoined from conducting the scheduled 2003 election of Albany County legislators pending adoption by the legislature of a new redistricting plan which creates a fourth majority/minority district determined to be compliant with the Voting Rights Act; and it is further

ORDERED that this case is referred to Magistrate Judge David R. Homer pursuant to 28 U.S.C. § 636(b)(1)(B) for the following purpose:

1. To consult with counsel for the parties and establish a scheduling order for submission of a revised redistricting plan and to conduct hearings, including evidentiary hearings if necessary and/or a trial on the question of the whether any such revised plan meets the requirements of the Voting Rights Act and to submit to the undersigned proposed findings of fact and recommendations for the disposition of this matter, including pendency of the preliminary injunction issued herewith.

IT IS SO ORDERED.

Dated: August 22 , 2003
Syracuse, New York

Norman A. Mordue
United States District Court Judge

34